Michael T. Rogers (MR-8813)
Douglas J. Lutz (DL-3190)
WASSERMAN GRUBIN & ROGERS LLP
1700 Broadway
New York, New York 10019
(212) 581-3320
*Attorneys for Plaintiff Energy Contract Recovery, LLC*

UNITED STATES DISTRICT COURT OF THE
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

ENERGY CONTRACT RECOVERY, LLC,

                Plaintiff,

        -against-

LONG ISLAND POWER AUTHORITY and PSEG
LONG ISLAND, LLC,

             Defendants.

---------------------------------------------------------------X

_____ Civ. ___ ___ (    )

## **COMPLAINT**

## **Jury Trial Demanded**

Plaintiff Energy Contract Recovery, LLC ("ECR"), by and through its attorneys, Wasserman Grubin & Rogers, LLP, as and for its Complaint against defendants Long Island Power Authority ("LIPA") and PSEG Long Island, LLC ("PSEG") (collectively referred to as "defendants"), respectfully alleges as follows:

## **INTRODUCTION**

1.     ECR is the "d/b/a" designation for SPE Utility Contractors, LLC (which will hereinafter be referred to as "ECR") that was retained by LIPA and PSEG to provide the labor, equipment and materials necessary for the construction of a new electrical transmission line and transmission feeder from the Great Neck to Port Washington areas of Long Island, New York.

2.     ECR has commenced this action because defendants have failed to pay ECR an amount due and owing for that work that exceeds $1.52 million.

3.      There is no dispute that ECR fully performed all of its obligations under the parties' contract, completed installation of the overhead and underground electrical transmission lines and that it incurred increased costs as a result of, among other things, defendants' failures to:  (i) obtain timely the necessary permits and traffic control restrictions; (ii) provide timely access to the sites from which it was necessary to perform the work, including those sites controlled by the defendants; (iii) describe accurately the site and existing underground conditions at the locations where the transmission lines were to be installed; (iv) deliver timely the materials defendants were contractually obligated to provide necessary for plaintiff to efficiently progress the work; and (v) coordinate properly services and work to be performed by others, negatively impacting ECR's work.

4.      The aforementioned failures often caused delays and led to defendants directing and requesting ECR to re-sequence its work, accelerate its work, such as performing work on weekends, and to perform additional work outside the scope of the base contract.

5.      Notwithstanding and despite ECR completing the contracted-for work, defendants have failed to pay any part of the more than $1.52 million outstanding balance due and owing to ECR for the installation services it performed.

## THE PARTIES

6.      ECR is the "d/b/a" name for SPE Utility Contractors, LLC, which is a limited liability company, organized and existing under and by virtue of the laws of the State of Michigan, having its offices located at 4400 Dove Road, Port Huron, Michigan 48060,

7.      ECR is engaged in the business of providing energy resource services, including, but not limited to the installation, repair and maintenance of electrical transmission lines, and is authorized to conduct business in the State of New York.

2

8. Upon information and belief, defendant Long Island Power Authority ("LIPA") is a corporate municipal instrumentality of the State of New York, organized and existing under and by virtue of the New York State Public Authority Law, authorized to sue and be sued, having offices located at 333 Earle Ovington Boulevard, Uniondale, New York 11553.

9. LIPA is engaged in the business of, *inter alia*, owning electrical power generation facilities and electrical transmission and distribution systems to provide electrical power on Long Island, New York.

10. Upon information and belief, defendant PSEG Long Island, LLC ("PSEG"), is a limited liability company, organized and existing under and by virtue of the laws of the State of New York, with offices at 333 Earle Ovington Boulevard, Uniondale, New York 11553.

11. PSEG is engaged in the business of providing energy services, including *inter alia*, operating the electrical transmission and distribution system for LIPA during the period of ECR's work that is the subject of this litigation.

## JURISDICTION AND VENUE

12. Jurisdiction is proper in this Court under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and the parties are citizens of different states in that under applicable law ECR is a considered a resident of the State of Michigan and the defendants are considered residents of the State of New York.

13. Venue is proper in this Court under 28 U.S.C. § 1391 because both defendants PSEG and LIPA would be subject to personal jurisdiction in this District in that both are organized and existing under the laws of the State of New York and have offices located within this District.

14.     Venue is also proper in this Court under 28 U.S.C. § 1391 because the substantial part of the events or the acts or omissions giving rise to the claims that is the subject of this action occurred within this District.

15.     The contract entered by the parties provides that "[a]ny action arising out of or relating to" the contract can be "brought in…[the] United States District Court for the Eastern or Southern Districts of New York."

## FACTUAL BACKGROUND

16.     In or about November 2013, LIPA, through its agent, at the time, National Grid Electric Services, Inc., entered a contract with ECR, pursuant to which it retained ECR to construct and install, among other things, new 69kV overhead electrical installation lines and 69kV underground electrical transmission feeder lines from the Great Neck to the Port Washington areas of Long Island, New York (hereafter the "Transmission Line Contract").

17.     The Transmission Line Contract provided that National Grid Electric Services, LIPA's agent at the time the Transmission Line Contract was executed, and PSEG, LIPA's agent at the time of ECR's performance of the work set forth in Transmission Line Contract, would be entitled and subject to all rights and remedies under the Transmission Line Contract as if it had been an original party thereto.

18.     The Transmission Line Contract provided that if LIPA or its agents, including PSEG, directed ECR to perform other, additional or extra work or otherwise modified the scope of work under the Transmission Line Contract, ECR would be entitled to payment and reimbursement for such work.

4

19.     The Transmission Line Contract provided that if ECR's work was "delayed by a [LIPA] act or omission, and [ECR] cannot make up for such delay by applying reasonable diligence and speed, [ECR] may receive compensation for such delay...."

20.     The Transmission Line Contract provided that if LIPA or its agent directed ECR to perform "additional efforts" to accelerate its work to conform with LIPA's schedule needs, and that, if such efforts were not necessitated by any act or omission by ECR that ECR would "be entitled to be reimbursed for the premium portion of overtime" it expended to conform with the requests by LIPA and PSEG to perform "additional efforts."

21.     Under the Transmission Line Contract project documents, PSEG had authority to act as LIPA's representative on the project including, *inter alia*, to (i) requesting or directing ECR to perform other, additional or extra work or otherwise modify the scope of work under the Transmission Line Contract (for which ECR would be entitled to additional compensation), and (ii) directing ECR to halt, delay or perform "additional efforts" to accelerate its work (for which ECR would be entitled to additional compensation and recoupment of any additional costs ECR incurred as a result of such directions).

22.     Under the Transmission Line Contract project documents, LIPA and PSEG were responsible for securing any necessary state or municipal work permits and traffic control restrictions necessary for ECR to construct and install the overhead and underground electrical transmission lines.

23.     Under the Transmission Line Contract project documents, LIPA and PSEG were responsible for providing timely access to the sites from which it was necessary to perform the work, including those sites controlled by the defendants.

24.     Under the Transmission Line Contract project documents, LIPA and PSEG were responsible for describing accurately the existing site and subsurface conditions at the locations where the transmission lines were to be installed.

25.     Under the Transmission Line Contract project documents, LIPA and PSEG were responsible for the timely delivery of the materials which defendants were contractually obligated to provide and which were necessary for ECR to efficiently progress the work.

26.     Under the Transmission Line Contract project documents, LIPA and PSEG were responsible for coordinating services and work to be performed by others, which if not coordinated correctly would adversely impact ECR's work.

27.     Under the Transmission Line Contract project documents, LIPA and PSEG were required to review equipment and material submittals in a timely manner and to provide their good faith approval of such equipment and material submittals.

28.     The defendants breached each of the aforementioned obligations owed to ECR under the Transmission Line Contract project documents.

29.     LIPA and PSEG failed to secure timely the necessary state or municipal work permits and traffic control restrictions necessary for ECR to construct and install the overhead and underground electrical transmission lines.

30.     For example, even though under the Transmission Line Contract the contract period was to commence in December 2013, defendants did not secure the permits necessary for ECR to perform line work until on or about February 11, 2014.

31.     In some areas, when ECR mobilized personnel to perform work its only to be informed by local municipal officials, including, for example, in March 2014, the Village of

Thomason, that LIPA and PSEG had not obtained local permission necessary for the work to proceed.

32.     Moreover, throughout the course of ECR's work under the Transmission Line Contract, the defendants failed to obtain the permits for lane closures on the streets necessary for ECR to perform the transmission line installation work.

33.     Permits required for lane closures on streets were not timely provided, including for such busy thoroughfares as Northern Boulevard and Port Washington Boulevard.

34.     LIPA and PSEG failed to provide for ECR timely access to the sites from which it was necessary to perform the work.

35.     For example, LIPA and PSEG failed to secure timely approval of modifications to the easement agreement from the Board of Commissioners of the Great Neck Park District which were necessary to provide access required for ECR to perform underground work.

36.     LIPA and PSEG also failed obtain timely permission for access to sites owned by the Long Island Rail Road necessary to perform portions of the Transmission Line Contract work.

37.     LIPA and PSEG even failed to provide in a timely access to sites owned, operated and controlled by LIPA and PSEG.

38.     For example, LIPA and PSEG failed to have a substation site in Great Neck ready timely for ECR personnel to commence underground excavation and installation work and, in fact, initially turned ECR personnel away from site on or about May 12, 2014 so that PSEG personnel could continue to perform other tasks unrelated to the Transmission Line Contract project.

39.     LIPA and PSEG failed to describe and/or accurately detail the existing site and subsurface conditions at the locations where the transmission lines were to be installed.

40.     For example, throughout the course of the project, when ECR performed excavation necessary to install new power poles, ECR discovered large boulders and other obstructions which LIPA and PSEG had represented would not be present.

41.     More alarmingly, ECR often discovered that many of the locations at which LIPA and PSEG wanted ECR to excavate for the purpose of erecting new electric line poles conflicted with existing water and sewer pipes.

42.     ECR also discovered that a number of locations at which LIPA and PSEG wanted ECR to excavate for the purpose of erecting new electric poles encroached on property owned by other entities.

43.     In fact, for a number of transmission poles, including but not limited to those designated as pole numbers 40, 41 and 42, even when LIPA and PSEG directed ECR to alternative locations to avoid conflicts, ECR discovered that the new locations also had conflicts.

44.     LIPA and PSEG failed to timely deliver the materials defendants were contractually obligated to provide necessary for plaintiff to efficiently progress the work.

45.     For example, during the project LIPA and PSEG failed to timely deliver distribution hardware, conductor cables, anchors and other materials.

46.     LIPA and PSEG failed to coordinate services and work performed by others that were a pre-requisite for ECR's work.

47.     For example, during the course of the project, PSEG crews failed to perform timely preparation work that was a pre-requisite for ECR's work.

48.     Throughout the project, LIPA and PSEG failed also to timely respond to Requests for Information.

49.     LIPA and PSEG also failed to timely review equipment and material submittals from ECR.

50.     For example, LIPA and PSEG failed to timely review manner pole rigging plans submitted by ECR and drilling plans submitted by an ECR subcontractor.

51.     During the course of ECR's work, LIPA and PSEG personnel, in violation of the terms of the Transmission Line Contract, attempted to direct and control the "means and methods" utilized by the workers retained by ECR, even though the Transmission Line Contract project documents expressly provided for "means and methods" to be controlled by ECR.

52.     The "means and methods" utilized by ECR met contract requirements and industry standards.

53.     In contrast, the directions or attempted directions by LIPA and PSEG, *inter alia*, resulted in unnecessary longer cable runs, caused the work take longer to complete and/or forced ECR to perform work out of planned sequence and to re-perform previously completed work.

54.     For example, LIPA and PSEG personnel directed or attempted to direct ECR as to, *inter alia*, the number of vacuum evacuation trucks to use, the sequence in which areas that ECR would commence or perform excavation, how to lay out its materials during preparation and the areas in which to lay conduit prior to installation.

55.     Disquietingly, on the occasions that ECR rebuffed the ill-advised attempts by LIPA and PSEG to impose incorrect "means and methods" for ECR's work, LIPA and PSEG personnel would become personally abusive and threatening to ECR employees (and, in fact, on

at least one occasion, threaten physical violence) and spitefully delay delivery of the materials they were obligated to provide under the Transmission Line Contract.

56.     Additionally, LIPA and PSEG rejected equipment and material submittals in bad-faith.

57.     For example, despite ECR having timely submitted the equipment requests and advising PSEG personnel that the equipment manufacturer had expressly represented that the equipment was sufficient to perform the work for which it would be utilized and that such equipment had in fact been previously approved by LIPA and PSEG for use on other similar projects, PSEG personnel disapproved ECR's cable pulling equipment, without stating the reason for doing so, on the eve of the date that ECR was to perform the work requiring the equipment.

58.     During the course of the project, ECR advised LIPA and PSEG that their aforementioned failures and impermissible attempts to direct ECR's means and methods had and were interfering with ECR's ability to progress the work and would delay the project.

59.     However, in response, LIPA and PSEG would threaten to delete and, on several occasions, did delete related scopes of the work, often on the eve of the date upon which ECR was set to perform that work and after ECR had incurred the costs for preparing to perform that work.

60.     For example, in May 2014, after ECR advised LIPA and PSEG that it had failed to deliver materials necessary for underground cable installation or to provide timely access to the Great Neck substation, LIPA and PSEG, upon information and belief, in retaliation for setting forth those and other complaints, at the last minute, and after ECR had incurred the cost for preparing to perform such work, deleted, *inter alia*, portions of the underground cable

installation, splicing and underground cable dips, without ever providing any electrical engineering rationale for deleting such work.

61.     During the course of the project, LIPA and PSEG personnel directed ECR employees to stop work on the Transmission Line Contract to provide pre-storm preparation and post-storm clean-up work delaying completion of the Transmission Line Contract project work.

62.     Moreover, LIPA and PSEG failed to compensate ECR at the correct rates for such storm-related services under the Transmission Line Contract or the separate storm-services contract ECR had with LIPA.

63.     The aforementioned decisions and failures by LIPA and PSEG often delayed the Transmission Line Contract project work, forced ECR to perform work out of planned sequence and to re-perform previously completed work.

64.     The aforementioned failures by LIPA and PSEG led defendants to request and direct ECR to accelerate its work, which included performing work on weekends, and to perform additional work outside the scope of the base contract.

65.     For example, although the Transmission Line Contract did not initially provide for weekend work, due to the aforementioned failures by LIPA and PSEG, during the approximately six months ECR performed its work, LIPA and PSEG directed ECR to work at least seven weekends, including the weekends of February 22, March 15, March 22, March 29, April 5, April 26 and May 3, 2014.

66.     ECR completed construction and installation of the overhead and underground electrical transmission lines and other work it was required to perform under the Transmission Line Contract except such work as LIPA and PSEG deleted from its scope of work.

67.     Neither LIPA nor PSEG has ever complained that ECR did not complete all work that it was required to perform or that such completed work did not comply with the Transmission Line Contract project documents.

68.     ECR completed all change order work.

69.     Neither LIPA nor PSEG has ever complained that ECR did not complete all change order work that it was directed to perform or that such completed change order work did not comply with the Transmission Line Contract project documents.

70.     ECR completed other additional work as requested and directed by LIPA and PSEG.

71.     Neither LIPA nor PSEG has ever complained that ECR did not complete all additional work as requested and directed by LIPA and PSEG or that such completed additional work did not comply with the Transmission Line Contract project documents.

72.     ECR performed and completed "additional efforts" to accelerate work to make up for time lost due to the acts and omission of LIPA and PSEG, including working outside of normal work hours, such as on Saturdays, at the direct request of LIPA and PSEG.

73.     Neither LIPA nor PSEG has ever complained that ECR failed to accelerate its work to make up for time lost due to the acts and omission of LIPA and PSEG, including working outside of normal work hours, such as on Saturdays, as directed and requested by LIPA and PSEG.

74.     ECR incurred additional costs and delays as a result of the aforementioned failures of LIPA and PSEG.

75.     Pursuant to the Transmission Line Contract, the total compensation to which ECR is entitled – including the balance of the base contract price, outstanding change orders, premium

12

time work as directed and agreed to by LIPA and PSEG, and other compensation permitted under the contract – exceeds $4.3 million.

76.     Defendants paid ECR only $2,716,487, leaving a balance to be proven at the time of trial of this action, but which is believed to exceed $1.52 million.

## AS AND FOR A FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

77.     ECR repeats, reiterates and realleges each and every allegation contained in Paragraphs Nos. "1" through No. "76" hereof, with the same force and effect as though more fully set forth at length herein.

78.     ECR fully performed all parts of the Transmission Line Contract required of it to be performed, except to the extent that such performance has been prevented and/or lawfully excused by the actions and/or omissions of the defendants.

79.     Defendants failed to pay the more than $1.52 million balance owed under the Transmission Line Contract.

80.     Defendants' failure to pay the balance owed constitutes a breach of the Transmission Line Contract.

81.     As a result of the defendants' breach of the Transmission Line Contract, ECR has sustained damages including, but not limited to, amounts owed for construction and installation services performed pursuant to the Transmission Line Contract.

82.     By reason of the foregoing, ECR is entitled to have judgment against the defendants in the amount to be proven at the time of trial of this action, but which is believed to exceed $1.52 million, together with interest, costs and disbursements of this action.

## AS AND FOR A SECOND CAUSE OF ACTION
### (UNJUST ENRICHMENT)

83.     ECR repeats, reiterates and realleges each and every allegation contained in Paragraphs Nos. "1" through No. "82" hereof, with the same force and effect as though more fully set forth at length herein.

84.     In the alternative, if the Court finds some of the work performed by ECR was not performed under the Transmission Line Contract, as set forth herein, ECR provided labor and materials, including the installation of overhead and underground transmission lines, at the specific request and for the benefit of defendants, the total value of which will be proven at the time of trial of this action, but which is believed to exceed $1.52 million..

85.     Defendants accepted and received the benefit of the installation services performed by ECR and, as a result, received substantial value as a result of ECR's work.

86.     ECR has not been paid in full for the labor and materials it supplied and defendants accepted and for which defendants received the substantial benefit.

87.     It would be unjust to allow defendants to retain the benefit of ECR's work without payment therefore.

88.     Defendants have been unjustly enriched in an amount to be proven at the time of trial of this action, but which is believed to exceed $1.52 million..

89.     By reason of the foregoing, ECR is entitled to have judgment against the defendants in the amount to be proven at the time of trial of this action, but which is believed to exceed $1.52 million, together with interest, costs and disbursements of this action.

## AS AND FOR A THIRD CAUSE OF ACTION
## (QUANTUM MERUIT)

90.     ECR repeats, reiterates and realleges each and every allegation contained in Paragraphs Nos. "1" through No. "89" hereof, with the same force and effect as though more fully set forth at length herein.

91.     In the alternative, if the Court finds that some of the work performed by ECR was not performed under the Transmission Line Contract, as set forth herein, ECR provide labor and materials to the project at defendants' specific request, the total value of the unpaid balance in an amount to be proven at the time of trial of this action, but which is believed to exceed $1.52 million.

92.     Defendants accepted ECR's work and retained the benefits of ECR's work without protest or objection.

93.     ECR performed the work for defendants with both ECR and defendants the expecting that defendant would pay ECR compensation for that work.

94.     Despite due demand by ECR, defendants have failed, refused and neglected to remit the outstanding payments due and owing for the work.

95.     The fair and reasonable value of the work performed by ECR is an amount to be proven at the time of trial of this action, but which is believed to exceed $1.52 million.

96.     By reason of the foregoing, ECR is entitled to quantum meruit damages for the value of its costs, labor and materials, which ECR incurred, expended and performed on behalf of defendants, which has not been paid, in an amount to be proven at the time of trial of this action, but which is believed to exceed $1.52 million.

**WHEREFORE**, plaintiff Energy Contracting Recovery, LLC, hereby demands judgment against the Defendants Long Island Power Authority and PSEG Long Island, LLC, as follows:

(a)    on the First Cause of Action, an amount to be proven at the time of trial of this action, but which is believed to exceed $1.52 million, together with interest, costs and disbursements of this action;

(b)    on the Second Cause of Action, an amount to be proven at the time of trial of this action, but which is believed to exceed $1.52 million, together with interest, costs and disbursements of this action;

(c)    on the Third Cause of Action, an amount to be proven at the time of trial of this action, but which is believed to exceed $1.52 million, together with interest, costs and disbursements of this action; and

(d)    for such other, further and different relief as this Court may deem just and proper.

Dated: August 17, 2015
New York, New York

**WASSERMAN GRUBIN & ROGERS, LLP**

By: _____
Michael T. Rogers (MR-8813)
Douglas J. Lutz (DL-3190)
1700 Broadway, 42nd Floor
New York, New York 10019
(212) 581-3320
*Attorneys for Plaintiff Energy Contract Recovery, LLC*